UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

ROBERTA M. RILEY,                                        :

                Plaintiff,                    :          <u>OPINION AND ORDER</u>

        -against-                              :

CAROLYN W. COLVIN,                                                   15 Civ. 8758 (GWG)

              Defendant.                    :
------------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

      Plaintiff Roberta M. Riley brings this action pursuant to 42 U.S.C. § 405(g) for judicial

review of the final decision of the Commissioner of Social Security denying her claims for

disability insurance benefits under the Social Security Act.  The parties have cross-moved for

judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).[1]  For the reasons stated below,

Riley's motion is granted to the extent of remanding the case for development of the record, and

the Commissioner's motion is denied.

---

[1] <u>See</u> Notice of Motion, filed May 11, 2016 (Docket # 22); Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Judgement on the Pleadings, filed May 11, 2016 (Docket # 23) ("P. Mem."); Declaration, filed May 11, 2016 (Docket # 24); Notice of Cross-Motion, filed June 3, 2016 (Docket # 29); Memorandum of Law in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion, filed June 3, 2016 (Docket # 30) ("D. Mem."); Reply Memorandum of Law in Further Support of Plaintiff's Motion for Judgment on the Pleadings and in Opposition to Defendant's Cross-Motion for Judgment on the Pleadings, filed June 14, 2016 (Docket # 31) ("P. Reply"); Reply Memorandum of Law in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Judgment on the Pleadings, filed July 1, 2016 (Docket # 32) ("D. Reply").

I. <u>BACKGROUND</u>

    A. <u>Riley's Claim for Benefits and Procedural History</u>

    Riley applied for disability insurance benefits on July 23, 2012.  <u>See</u> Administrative Record, filed Mar. 4, 2016 (Docket # 17) ("R."), at 317.  Riley claimed to be disabled due to a conduct disorder, bipolar disorder, mood disorder, post traumatic stress disorder, and "small partial thickness tear of the strained infraspinatu[s] [muscle]."  R. 167.  She claimed that her disability began on January 15, 2012.  R. 144.  It appears that in January 2011 she had been arrested and allegedly assaulted by police officers.  <u>See</u>, <u>e.g.</u>, R. 42, 243, 246.

    The Social Security Administration initially denied Riley's claim on January 25, 2013.  R. 80-85.  Riley requested a hearing before an Administrative Law Judge ("ALJ").  R. 86-87.  Riley appeared <u>pro se</u> before ALJ Michael Friedman at a hearing on February 27, 2014, which was adjourned so Riley could obtain an attorney.  <u>See</u> R. 29-36.

    Riley appeared again before the ALJ on June 23, 2014.  R. 37-64.  She was represented by an attorney, Douglas Kugal.  R. 37, 39.  On June 27, 2014, the ALJ issued a written decision denying Riley's claim.  R. 9-22.  Riley appealed the decision on July 21, 2014.  R. 7; <u>see also</u> R. 234-38 (claimant's brief to the Appeals Council).  On September 17, 2015, the Appeals Council denied Riley's request for review.  R. 1-3.  Represented by a different attorney, Riley filed this lawsuit.  <u>See</u> Complaint, filed Nov. 6, 2015 (Docket # 8).

    B. <u>Summary of Facts Provided by Riley in Forms</u>

    Riley was born on January 16, 1963, R. 163, and thus was one day short of her 49th birthday at the time of her alleged onset date, R. 69.  Riley had completed one year of college education.  R. 168.  She held a variety of jobs between 1999 and the date of her application, including "car biller," "tax preparer," and working on "inventory" at a telemarketing business.

2

Id. (capitalization omitted); see also R. 175, 198-205 ("Work History Report").

Riley answered questions in a "Function Report-Adult" on December 5, 2012.  R. 187-97.  In this document, she described her daily activities and the symptoms of her conditions.  She reported not being able to sleep and suffering from nightmares.  R. 188.  She noted that it "takes longer" for her to get dressed, and that bathing, hair care, and shaving were "painful."  R. 188-89.  She reported needing to be "[r]emind[ed] . . . to eat and take [her] medication."  R. 189.

Riley reported that she cooks "once weekly," making food such as "chicken and rice or steak and potatoes," R. 189, but she "mostly eat[s] yogart [sic] and fruit or junck [sic] food," R. 190.  She noted that she "do[esn't] cook much because sometimes I forget that I am cooking." Id.  She reported being able to clean and do laundry on her own, but that it "takes [her] a few months." Id.

She stated that she only goes outside "when I have a doctor's [appointment] or other [appointment] or shopping to get food with help from a friend." Id.  She wrote that her "medicine from [her] doctor for sleeping makes me tired [and] dizzie [sic]." Id.  She reported using public transportation, walking, and riding in cars when she went out, but reported that using public transportation was difficult because she "usualy [sic] gets in altarcation [sic]" since she "like[s] [her] space." Id.  Riley had a driver's license but did not drive because she was "scared to be stop[ped] by police."  R. 190-91.  She reported shopping for food and clothes "twice a month [for] about an hour," noting that other people would take her shopping or shop for her.  R. 191.  Riley reported going to the doctor two to four times a week.  R. 192.

Riley stated that she was able to pay bills, count change, and handle a savings account. R. 191.  She claimed her ability to handle money had not changed since her onset date.  Id.

Riley wrote that she had "many hobbies and [i]nterests," and enjoyed being around

3

people, but her ability and interest to engage in her hobbies and socialize had declined

significantly due to her disability.  See 191-92.  She stated that she did not "like leaving [her]

house anymore," and that she had to "make [her]self go outside to visit friends [and] family."  R.

192.  However, she noted that she was "normaly [sic] social[] [and] friendly" with "family and

friends but stand off [sic] with strangers."  Id.

In general, Riley wrote that her daily activities consisted of "dealing with pain

management and anxiety," and that her "daily routine has been affected because of the pain and

anxiety."  R. 197.

Riley claimed that pain in her right arm prevented her from lifting, reaching, and

performing some activities with her hands.  See R. 192-93.  She reported using a splint, which

was prescribed by a doctor, see R. 193-94, which she needed to use "all the time," R. 194.  She

could walk "about 9 Blocks" before she needed to stop and rest for "about 5 minuets [sic]."  Id.

Riley also claimed to have trouble concentrating and a fear of the police.  Id.  She wrote

that stress or changes in her schedule "cause[] anxiety [and] hypo venilation [sic] burst of

anger," and that she had "short term memory loss."  R. 195.

Riley described the pain in her right shoulder as "acheing [sic] and stabbing," and stated

that it would spread "through [her] entire arm."  R. 195-96.  She reported feeling the pain "all the

time," and that "using [her] right arm" by "writing, lifting, [or] reaching" brought on pain lasting

"all the time."  R. 196.  She stated that she took Tramadol and Ibuprofen multiple times a day to

deal with the pain.  See id.; see also R. 222 (indicating that Riley took Diazepan for "panic

disorder," Tramadol and Meloxican for "pain," and Trazadone for "mood disorder").

4

C.  The Medical Evidence

Riley and the Commissioner have each provided a summary of the medical evidence contained in the administrative record.  See P. Mem. at 3-8; D. Mem. at 1-15.  The Court adopts the parties' summaries, which do not conflict in any material way, as accurate and complete for purposes of the issues raised in this suit.  We discuss the portions of the medical record pertinent to the adjudication of this case in section III below.

D.  The Hearing before the ALJ

Riley testified that she lived alone in an apartment.  R. 40.  Her last job was "[g]ift wrapping," id., a position she held for "about two weeks," R. 41.  She initially stated that she did not remember working at any job that lasted as long as six months "since about 2000," id., but then admitted that she had a job working at a car dealership from 2001 to 2008, see R. 41-42.  She described her job as "print[ing] out the paperwork" when "somebody purchases a car."  Id.

Riley testified that her right arm pain began "[i]n 2011" after she was "assaulted by a police officer."  R. 42.  She "had a couple of different physical therapists."  Id.  She stated that she could "[p]robably" lift "about five or 10 pounds," id., and affirmed that she could "pick up small things, like a pen or a fork."  R. 42-43.  She stated that the "last place [she] was going to" for medical care for her right arm was "Hospital for Special Surgery."  R. 43.  She admitted that she had not been there — or received any other medical treatment for the arm — "for about a year and a half."  See id.

The ALJ then questioned Riley about her "mental or emotional condition."  Id.  Riley testified that she saw a psychiatrist "[o]nce a month," and that this psychiatrist gave her medication.  Id.  She reported that she had seen a therapist as well "at one time, but [the therapist] left, and they never gave me another one."  R. 43-44.  Riley stated that she took

5

medication.  Id.  When the ALJ asked if "the medication help[ed]" her, she responded, "it helps me sleep."  Id.

Riley indicated that she found it was difficult for her to concentrate or focus, be around people, remember things, and that she was easily upset or angered.  See id.  She stated that her psychiatrist had not helped her "as far as the depression," but as "far as going to sleep, yeah." Id.

The ALJ asked Riley if she "ha[d] a lawsuit going on" related to the alleged assault by police officers.  R. 45.  She told him that she had a lawsuit at one point, but that it was settled. See id.  She said that other than her arm pain, she only felt pain "in [her] feet time to time," which doctors had not explained to her.  Id.

Riley told the ALJ that a friend did her grocery shopping for her.  R. 45-46.  She "used to cook 'til [she] started burning things."  R. 46.  She did "not eat much . . . a smoothie or a salad." Id.  She reported that her friend "puts the trash out," but that her apartment otherwise did not need cleaning.  Id.

Riley "used to" like to read, id., and "channel surf[s]" when she watches television, R. 47.  She drinks alcoholic beverages "[o]nce in a blue moon" and smokes "[a]bout a pack [of cigarettes] a day."  Id.

Riley described her average day as involving "sur[fing] channels" and "look[ing] at the Internet."  Id.  She said that, "[s]ometimes, [she] look[s] for jobs."  Id.  When the ALJ asked "what kind of jobs" she looked for, she responded, "[a]ny kind of job."  Id.  She also indicated that she had no preference as to what type of work she would do.  See R. 48.

The ALJ asked Riley, "[W]hat do you think it is that keeps you from working today? What is the main difficulty you have that keeps you from working?"  Id.  She responded, "[t]he

6

medication I take makes me tired.  Sometimes, I feel faint."  Id.

On examination by her attorney, Riley testified that she had been obtaining psychiatric care at The Institute for Family Health ("TIFH") approximately once a month since 2011.  See id.  She received medication from these visits, which she took as prescribed.  See R. 48-49.  She responded affirmatively when her attorney asked if "the person prescribing the medications also talk[s] to" her.  R. 48.

Riley had taken "a whole bunch of different medications" since 2011.  R. 49.  She believed that her fatigue was a side effect of the medication, and she had told her psychiatrist about this problem.  See id.  She described her fatigue as making her "tired; I feel sometimes like I'm going to pass out."  Id.

Riley stated that she has trouble keeping jobs.  Id.  She affirmed that she was "able to get a job," but that she was "not able to keep the job."  See R. 50.  She testified that her difficulties at past jobs included "[a]rguing with the customers, co-workers, [and] forgetting things."  Id.  She indicated that she had been fired from "[m]ost of [her] jobs" because of her "attitude."  See id.  Riley testified that she discusses this problem with her psychiatrist.  Id.

The attorney asked Riley "[h]ow . . . depression impact[s] upon [her] ability to function." Id.  She responded that she "do[es]n't want to go outside and be around people."  Id.  She also testified that she was having difficulty concentrating and focusing.  See R. 50-51.  She elaborated: "I could be watching something, and forget what I saw.  Like, if I turn the TV on to see what the weather is, I could be watching it, and I don't even remember what the weather person said."  R. 51.

Riley testified that when she was around other people, "[m]ost of the time, they say I'm nasty, my attitude."  Id.  She gave an example of when "[t]he manager at the FAO Schwarz that

was gift wrapping said I was condescending to her and my co-workers." Id.

Riley discussed her fear "that somebody's going to come in my house and get me." Id. She stated that she "hear[s] noises. And if I don't take my medicine, I don't go to sleep." Id. She testified that this was a result of the assault. See id. Prior to the assault in 2011, she was "getting fired from jobs," but the symptom of "not going outside" emerged after the assault. R. 52.

The ALJ took testimony from Vocational Expert ("VE") Helene Feldman. See R. 52. Feldman classified Riley's previous work at the car dealership as "a billing cash clerk." See R. 52-53. The ALJ gave the VE a hypothetical involving an individual with "a medium physical RFC; restricted to jobs involving only occasional contact with supervisors, co-workers, and the public; and requiring only tasks of a simple, routine, and repetitive nature." R. 53-54. The ALJ asked the VE for three examples of "jobs in the national economy which such a person could perform." R. 54. The VE provided three examples: "warehouse worker," with a DOT Code of 922.687-058, see R. 54-55; "linen room attendant," code 222.387-030, R. 55; and "bagger," code 920.687-014, see R. 55-56.

The ALJ asked Riley about these jobs. See R. 57-59. Riley articulated certain worries she had: namely, that she might have "[a]rguments with the customers" if she were a bagger, because she "might not pack the bag the way the customer wants." R. 57. She also indicated that she had concerns about working as a linen room attendant, such as "put[ting] [the linens] in the wrong place," and "go[ing] in and interview[ing] to get the job." R. 59.

The ALJ questioned Riley about her earlier statement that she would sometimes look for work. R. 59; see also R. 47. She stated that she looked for "[c]lerical jobs." R. 59. The ALJ noted that because "clerical jobs involve working with people," which is "something you feel

8

that you can't do," he had not "even includ[ed] that kind of hypothetical to the expert."  R. 60.

Riley explained that she had looked for those jobs "because that's what [her] experience is in."

Id.

Riley's attorney then examined the VE.  See id.  He asked the VE to consider someone

who "due to deficits in attention and concentration was going to be off-task about 20 percent of

the time, 20 percent of the day."  Id.  The VE responded that such a person "would not be able to

maintain employment."  Id.  Her attorney asked about an individual who "couldn't sustain an

ordinary routine without supervision."  Id.  Specifically, he asked if such a person in "the linen-

type job," id., would have a supervisor "that would check in on them, and how much time would

be tolerated to spend with them showing them repeatedly how to do the job," R. 61.  The VE

replied, "it's a very simple task, they would need to be shown what needs to be done, where

things are placed, and, otherwise, they work independently."  Id.

The ALJ confirmed with the VE that "[a]n employee who's off-task 10 percent or more

of the time cannot do this kind of work," to which the VE responded "[c]orrect."  R. 62.  The VE

also informed the ALJ that "[t]ypically," such employees get one day of sick leave per month.

Id.

### E.  The ALJ's Decision

The ALJ issued his decision denying Riley's claim on June 27, 2014.  See R. 22.  The

ALJ decided that Riley met "the insured status requirements of the Social Security Act through

December 31, 2016"; that she "ha[d] not engaged in substantial gainful activity since January 15,

2012, the alleged onset date"; and that she suffers from "the following 'severe' impairments:

posttraumatic stress disorder (PTSD) and depressive disorder."  R. 14.

However, the ALJ found that Riley did "not have an impairment or combination of

impairments that meets or medically equals the severity of one the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)."  Id.  In reaching this determination, the ALJ found that "in activities of daily living, the claimant has mild difficulties," with "moderate difficulties" in "social functioning," and "moderate difficulties" in "concentration, persistence or pace."  R. 15.

Specifically, the ALJ noted that Riley's "mental status examination on January 2, 2013 was within normal limits."  Id.  He highlighted Riley's reports that "she dresses, bathes and grooms herself, cooks, prepares food, cleans, does laundry, shops and manages her own money"; that she "takes public transportation on her own but only if necessary"; and that she "has a lot of friends and gets along well with her family."  Id.  The ALJ noted that Riley reported that she "goes out alone," "can shop by computer," and "retains adequate attention/concentration for watching television and reading."  Id.  He stated that Riley's "thought processes are coherent and goal-directed and her speech fluent and clear with adequate expressive and receptive language." Id.  He noted that a "treating source on October 7, 2011 found her attention alert; normal thought content; minimally impaired judgment."  Id.  Given this assessment, the ALJ found that neither "paragraph B" criteria nor "paragraph C" criteria were satisfied, referring to categories for determining the severity of a mental impairment.  R. 15-16.[2]

---

[2] For mental disorders, the "Paragraph B" and "Paragraph C" criteria "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity."  20 C.F.R. Part 404, Subpt. P, App. 1 §12.00(A).  A claimant can satisfy the "Paragraph B" criteria by a showing of at least two of the following: "Marked restriction of activities of daily living"; "Marked difficulties in maintaining social functioning"; "Marked difficulties in maintaining concentration, persistence, or pace"; or "Repeated episodes of decompensation, each of extended duration."  See, e.g., id. §§ 12.04(B), 12.06(B).  "Marked" is defined as "more than moderate but less than extreme" and may arise "when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [a claimant's] ability to function independently, appropriately,

Notwithstanding the limitations he identified in assessing Riley's mental health "at steps 2 and 3 of the sequential evaluation process," the ALJ found that the "mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process" led to the conclusion that Riley "has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except limited to jobs involving simple, routine, repetitive type tasks requiring only occasional interaction with supervisors, co-workers and the public." R. 16.

The ALJ reached this finding after "consider[ing] all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." Id. He found that Riley's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." R. 18.

As to plaintiff's mental health, the ALJ relied on records of Riley's treatment at TIFH, a consultative examination from John Miller, Ph.D., a report by Dr. Pik Sai Yung, and records from Physician's Assistant Harold Charles. See R. 17-18, 19-20.

The TIFH records were authored by Mable Cobin, Dr. James Weisbard, and Jodi Bassett. See R. 17. The ALJ found that Cobin's records from June 24, 2011, showed that Riley "denied auditory/visual hallucinations and suicidal/homicidal ideation," "denied alcohol and substance abuse," and "reported [that] she was never diagnosed with a mental illness and [was] having a difficult time due to the assault by NYPD." R. 17. The ALJ noted "treating source psychiatrist Dr. Weisbard on October 7, 2011 found [Riley's] attention alert; normal thought content; minimally impaired judgment. Diagnosis was major depressive disorder, single episode." Id.

---

effectively, and on a sustained basis." Id. § 12.00(C). "Paragraph C" requires that a claimant have a "complete inability to function outside the area of one's home." Id. § 12.06(C).

The ALJ interpreted Dr. Weisbard's records from the January 23, 2012, follow-up visit as "generally within normal limits." Id.

The ALJ examined the records produced by Jodi Bassett, LMSW, on December 13, 2012. Id. The ALJ emphasized that Riley reported that she was not taking medication at that time. Id. Bassett noted that Riley "responded well to therapy and agreed to exercise by doing yoga and to go to a holiday party." Id. Bassett saw Riley again on January 7, 2013, "for symptoms associated with major depression, single episode and PTSD." Id. Riley reported taking medication. Id. At that time, Bassett "noted [Riley] receives social support with children, friends and extended family and there are no barriers to meeting short-term goals." Id.

The ALJ discussed the consultative psychiatric evaluation conducted by John Miller, Ph.D., on January 2, 2013. R. 17-18. Riley reported "[d]epressive symptoms includ[ing] occasional social withdrawal," and "[a]nxiety related symptoms includ[ing] being easily fatigued, irritability, having nightmares, flashbacks . . . hypervigilance" and "panic attacks that occur on average once or twice a week characterized by breathing difficulties, occasional disorientation and dizziness." R. 17. Riley ascribed these symptoms to being "arrested one night while she was asleep in her bed," when "she was assaulted by the arresting police officers." Id. Riley reported that her anxiety attacks could be triggered by seeing police officers. Id. She also reported "auditory hallucinations . . . [and] paranoid ideation that causes her to feel that authority figures want to hurt her." Id. Riley also told Dr. Miller that she suffered from "short-term memory deficits that cause her to go into a room and then forget why she went there, cause her to leave the stove on and walk away and cause her to forget appointments." Id. The ALJ discounted the statements Riley made to Miller because these statements were inconsistent with her treatment notes and other evidence in the record, such as "[m]ental status exams .

. . report[ing] claimant consistently as alert with no attention/concentration problems alluded to," id., and the fact that treatment notes made no mention of nightmares, flashbacks, hypervigilance, panic attacks, or hallucinations, or short-term memory problems, see R. 17-18.

The ALJ noted that Dr. Miller opined that Riley could follow and understand simple directions and instruction, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, and make appropriate decisions.  R. 18.  He found that while she has "trouble dealing appropriately with stress" and "cannot relate adequately with authority figures," she "can relate adequately with others."  Id.  The ALJ gave Miller's opinion "significant weight" because his finding that "claimant functions relatively well except for problems relating to authority figures, specifically police," was "consistent with her allegations."  R. 20.

The ALJ noted a March 8, 2013, report by "treating psychiatrist Dr. Yung."  R. 19.  This report indicated that Riley had "'mild depressive symptoms' and no 'significant posttraumatic stress disorder.[']"  Id. (quoting R. 401-02).

The ALJ reviewed documents submitted by Physician's Assistant Harold Charles.  Id.  Charles "completed a Psychiatric/Psychological Impairment Questionnaire dated May 29, 2014 wherein he reports [Riley] with major depressive disorder and PTSD and current GAF of 60."[3]

---

[3] As explained in the fourth edition of Diagnostic and Statistical Manual of Mental Disorders 25 (4th ed., text revision 2000) ("DSM-IV"), the DSM-IV utilized a "multiaxial system" that allowed for the separate assessment of different aspects of a patient's condition.  Id.  The axes were as follows:

| | |
|---|---|
| Axis I | Clinical Disorders [and] Other Conditions That May Be a Focus of Clinical Attention |
| Axis II | Personality Disorders [and] Mental Retardation |
| Axis III | General Medical Conditions |
| Axis IV | Psychological and Environmental Problems |

Id.  Charles "note[d] claimant with symptoms of sleep disturbance, mood disturbance, panic attacks, social withdrawal and decreased energy."  Id.  He "reported no evidence limitations [sic] of claimant's ability to remember locations and work-like procedures and mild limitations to understand and remember one or two step instructions and moderate limitation in ability to understand, remember and carry out detailed instructions."  Id.  Charles "indicated [Riley] is markedly limited in ability to maintain attention and concentration for extended period[s]" and found "her ability to sustain an ordinary routine without supervision markedly limited but her ability to work in coordination with or proximity to others without being distracted by them only moderately limited."  Id.  The ALJ further noted Charles's findings that Riley was "markedly limited in [her] ability to complete a normal workweek without interruptions from psychologically based symptoms," but that Riley was "only mildly limited [in her ability] to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance."  Id.  Charles also found Riley "either mildly or moderately limited in social interaction and only mildly limited in ability to travel to unfamiliar places or use public transportation."  Id.  The ALJ noted that Charles "opine[d] [Riley], on average, would likely be absent from [work] more than 3 times a month as a result of the impairment or treatment but

---

        Axis V        Global Assessment of Functioning

Id.  These axes and the accompanying Global Assessment of Functioning ("GAF") scale are no longer in use.  See Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013) (stating that the latest edition of the DSM "has moved to a nonaxial documentation of diagnosis").

        The GAF scale reported an individual's "psychological, social, and occupational functioning" and was viewed as "particularly useful in tracking the clinical progress of individuals in global terms, using a single measure."  DSM-IV at 30.  A GAF score of 60 indicates "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning."  Id. at 32 (emphasis omitted).

[Charles] does not differentiate whether these absenteeism [sic] would be because of treatment or symptoms."  Id.

The ALJ also referred to certain treatment notes made by Charles in the course of his relationship with Riley.  Specifically, Charles reported on July 17, 2013, that Riley was "clinically stable with adequate insight and judgment, no psychotic features, no suicidal/homicidal ideation."  Id.  Charles "found her thought process intact, her mood unremarkable, no hallucinations, average intelligence and cognition within normal limits."  Id.  "On January 8, 2014, PA Charles noted claimant's symptoms controlled with medications" and a "mental status exam was generally within normal limits."  Id.  "Progress notes from April 18, 2014 indicated claimant reported 'I have been doing alright' but has difficulty sleeping," and that Riley told Charles that she was without "side-effects from medications."  Id.  "On June 14, 2014, the claimant reported to PA Charles that she is doing ok and sleeping good [sic] with the medications."  Id.  The ALJ referred to the "most recent treatment notes for May 14, 2014," which "show[ed] diagnoses of depression and PTSD"; treatment reports "from April 16, 2014" indicated that Riley "just completed a temporary seasonal job but has had some anxiety/panic attacks along with difficulty sleeping."  R. 20.

The ALJ gave PA Charles's opinions "partial weight because he also reports claimant with a GAF of 60," where "[a] GAF score of fifty-one to sixty (51-60) indicates moderate symptoms . . . but no marked symptoms."  Id. (emphasis omitted).  The ALJ "note[d] that [Riley's] GAF is on the high side of this differential and a GAF of 61 would only indicate some mild symptoms."  Id.  The ALJ gave "significant weight" to Charles's finding of "no evidence limitations [sic] of claimant's ability to remember locations and work-like procedures and mild limitations to understand and remember one or two step instructions and moderate limitation in

ability to understand, remember and carry out detailed instructions." Id.  The ALJ similarly gave "significant weight" to Charles's "opinion finding [Riley] either mildly or moderately limited in social interaction and only mildly limited in ability to travel to unfamiliar places or use public transportation." Id.  The ALJ gave "no weight" to Charles's "opinion that, on average, [Riley] would likely be absent from [work] more than 3 times a month as a result of the impairment" because this finding was "non-specific and is not consistent with progress notes or a GAF of 60." Id.

As for her alleged physical impairment, the ALJ found that Riley's "allegations of right arm problems do not cause more than minimal limitations and is [sic] therefore non-severe under the Regulations." R. 19.  The ALJ also found that Riley's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible." R. 18.  The ALJ noted that "physical examinations have been generally within normal limits." R. 18-19.  The ALJ highlighted a July 28, 2011, physical exam from Mount Sinai Medical Center which showed "claimant in no acute distress," with a "[m]usculoskeletal examination indicat[ing] full range of motion of shoulder, tenderness elicited at 180 degrees with abduction, full range of motion of elbow, slight decrease range of motion of 4th digit, slight swelling of PIP, non-tender otherwise." R. 19.  The ALJ also noted a "[p]hysical [e]xam on October 25, 2012 at The Hospital for Special Surgery" which "noted that [Riley] had right shoulder pain since January 2011." R. 18.  Riley's right hand was X-rayed during that hospital visit and the X-ray came back negative. Id.  The ALJ noted that Riley was "apparently able to do yoga post her alleged assault injuring her right arm." R. 19 (citing R. 332).

The ALJ supported his RFC analysis by referring to Riley's hearing testimony that "she has had a long series of short-term jobs due to difficulties getting along with supervisors and

coworkers," which was documented in the record.  R. 20 (citing R. 163-85).  The ALJ noted that Riley "related well" to him at the hearing "and she answered questions quickly and appropriately without any evidence of a memory or concentration problem."  Id.  The ALJ concluded by explaining that he gave Riley a "medium" RFC "because of persistent complaints of tiredness due to difficulty with sleep."  Id.  Also, in light of "her depressive and anxiety related symptoms," the ALJ "limited her to jobs involving only simple, routine, repetitive type tasks requiring only occasional interaction with supervisors, coworkers, and the public."  Id.

Given his RFC determination, the ALJ found that Riley was "unable to perform any past relevant work," id., such as her work as a "billing, tax preparer, telemarketing, and customer service representative for the State of New York,"  R. 21.

The ALJ found that Riley was "48 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date," that she "has at least a high school education and is able to communicate in English," and that "[t]ransferability of job skills is not material to the determination of disability."  R. 21.  Thus, "[c]onsidering [Riley's] age, education, work experience, and residual functional capacity," the ALJ concluded that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." Id.  Specifically, the ALJ noted three "representative occupations": (1) "[w]arehouse worker, DOT Code: 922.687, medium exertionally, SVP 2"; (2) "[l]inen [r]oom [a]ttendant, DOT Code: 222.387-030, medium exertionally, SVP 2"; and (3) "[b]agger, DOT Code: 920.687-014, medium exertionally, SVP 2."  R. 21-22.  The ALJ relied on "the testimony of the vocational expert" to "conclude[] that . . . the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy."  R. 22.  Thus, the ALJ concluded that Riley "has not been under a 'disability', as defined in the Social Security Act,

from January 15, 2012, through the date of [the ALJ's] decision." Id.

## II.  APPLICABLE LAW

   A.  Scope of Judicial Review Under 42 U.S.C. §§ 405(g) and 1383(c)

   A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (citation and quotation marks omitted); accord Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008); see also 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); id. § 1383(c)(3).  Substantial evidence is "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); accord Burgess, 537 F.3d at 127-28; Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

   "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citation and internal quotation marks omitted).  Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)); accord McIntyre v. Colvin, 758 F.3d 146, 149 (2d Cir. 2014) ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.") (citation omitted).  The Second Circuit has characterized the "substantial evidence" standard as

"a very deferential standard of review — even more so than the 'clearly erroneous' standard."

Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447-48 (2d Cir. 2012) (per curiam) (citation

omitted).  "The substantial evidence standard means once an ALJ finds facts, [a court] can reject

those facts only if a reasonable factfinder would have to conclude otherwise."  Id. at 448

(emphasis in original) (citation and internal quotation marks omitted).  "The role of the

reviewing court is therefore quite limited and substantial deference is to be afforded the

Commissioner's decision."  Johnson, 563 F. Supp. 2d at 454 (citation and internal quotation

marks omitted).

    B.  Standard Governing Evaluation of Disability Claims by the Agency

The Social Security Act defines the term "disability" as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); accord id.

§ 1382c(a)(3)(A).  A person will be found to be disabled only if it is determined that his

"impairment or impairments are of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in any other kind

of substantial gainful work which exists in the national economy."  Id. §§ 423(d)(2)(A),

1382c(a)(3)(B).

    To evaluate a claim of disability, the Commissioner is required to examine: "(1) the

objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective

evidence of pain or disability testified to by the claimant or others; and (4) the claimant's

educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037

(2d Cir. 1983) (per curiam) (citations omitted).

Regulations issued pursuant to the Social Security Act set forth a five-step process that the Commissioner must use in evaluating a disability claim.  See 20 C.F.R. § 404.1520(a)(4); see also Burgess, 537 F.3d at 120 (describing the five-step process).  First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(I).  Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," id. § 404.1520(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," id. § 404.1520(c).  Third, if the claimant's impairment is severe and "meets or equals" one of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1, and "meets the duration requirement," the claimant must be found disabled.  Id. § 404.1520(a)(4)(iii).  Fourth, if the claimant's impairment does not meet or equal one of the listed impairments, or does not meet the duration requirement, the Commissioner must review the claimant's residual functional capacity to determine if the claimant is able to do the work he or she has done in the past, i.e., "past relevant work."  Id. § 404.1520(a)(4)(iv).  If the claimant is able to do such work, he or she is not disabled.  Id.  Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's residual functional capacity, in addition to his or her age, education, and work experience, permit the claimant to do other work.  Id. § 404.1520(a)(4)(v).  If the claimant cannot perform other work, he or she will be deemed disabled.  Id.  The claimant bears the burden of proof on all of these steps except the final one — that is, proving that there is other work the claimant can perform.  See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

III.  DISCUSSION

Riley argues that the Commissioner's decision should be overturned for three reasons: (1) the ALJ improperly decided that her right shoulder injury was not severe because, inter alia, he failed to develop the record enough to make such a decision, see P. Mem. at 10-12; P. Reply at 15-16; (2) the ALJ "failed to give deference to the opinions of Plaintiff's treating physicians" with respect to her mental disabilities and "failed to apply the correct legal standard" to those opinions, P. Mem. at 12; and (3) "[t]he ALJ improperly discounted [her] credibility," id. at 15.

We discuss only the argument as to the failure to develop the record as we find it meritorious.

A. Failure to Develop the Record As to Riley's Shoulder Complaints

Plaintiff argues that "the ALJ's dismissal of the severity of Plaintiff's right shoulder impairment without attempting to seek additional information regarding the state of Plaintiff's condition . . . constitutes a failure to fully and [sic] develop the record." P. Reply at 16.

1. Law Governing An ALJ's Duty to Develop the Record

When an ALJ assesses a claimant's alleged disability, an ALJ must develop the claimant's medical history for at least a twelve-month period. See Shaw, 221 F.3d at 131 ("The ALJ has an obligation to develop the record in light of the non-adversarial nature of the benefits proceeding . . . .") (citing cases); accord Sims v. Apfel, 530 U.S. 103, 111 (2000) (ALJ has a "duty to investigate the facts and develop the arguments both for and against granting benefits") (citation omitted); 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. § 404.1512(d). The governing statute provides that the ALJ "shall make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make" the disability determination. 42 U.S.C. § 423(d)(5)(B); accord 20 C.F.R. §§ 404.1512(d), 416.912(d). The ALJ's duty to develop the record remains the

21

same regardless of whether the claimant is represented by counsel.  Tejada v. Apfel, 167 F.3d

770, 774 (2d Cir. 1999) (citing Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996)); accord Cancel v.

Colvin, 2015 WL 865479, at *5 (S.D.N.Y. Mar. 2, 2015) (citing cases).  Where the ALJ fails to

develop the record, remand is appropriate.  Rosa v. Callahan, 168 F.3d 72, 82-83 (2d Cir. 1999).

On the other hand, it is well established that "where there are no obvious gaps in the

administrative record, and where the ALJ already possesses a 'complete medical history,' the

ALJ is under no obligation to seek additional information in advance of rejecting a benefits

claim." Id. at 79 n.5 (citing Perez v. Chater, 77 F.3d 41, 48 (2d Cir. 1996) (where the ALJ had

"already . . . obtained and considered reports" from treating physicians, the ALJ "had before him

a complete medical history, and the evidence received from the treating physicians was adequate

for him to make a determination as to disability")).

### 2.  Medical Evidence Relating to Riley's Arm

Riley visited the Mount Sinai Diagnostic and Treatment Center on April 8, 2011, where

she was seen by Craig Napolitano, M.D.  R. 286.  Riley's chief complaint was "assault."  Id.

She claimed that since the assault "incident in Jan 2011 . . . she has had right should[er] pain

with movement and 4th digit pain on same side."  Id.  A "musculoskeletal" examination found

"normal gait and no clubbing, cyanosis, moving all extremities equally.  Right shoulder with no

point tenderness, no clavicular tenderness."  R. 288.  Dr. Napolitano found "pronounced

clubbing of all fingers."  Id.  Overall, Dr. Napolitano described the exam as "grossly nml [sic],"

noting "[r]otator cuff tendinitis."  Id.

In a visit to the Mount Sinai Diagnostic and Treatment Center on July 28, 2011, Riley

was diagnosed with "[r]otator cuff tendinitis."  R. 282.  At that visit, she reported "pain in her

shoulder extending down through her arm to her 4th digit in her right arm only."  R. 283.  At that

visit, she was physically examined by Mark R. Kahn, M.D.  R. 284.  That examination found

Riley had "[f]ull range of motion of shoulder, tenderness elicited at 180 degrees with abduction,

full range of motion of elbow, slight decrease range of motion of 4th digit, slight swelling of

PIP, non-tender otherwise."  Id.  On the same visit, Daniel Zanchetti, M.D., confirmed Dr.

Kahn's findings.  See R. 284-85.  Specifically, Dr. Zanchetti found that Riley had "[f]ull [range

of motion] but pain at 180 degrees in right shoulder with abduction.  Non-tender to palpation.

Passive range of motion full.  3rd visit for the same complaint."  R. 285.

 Notwithstanding these findings, on October 25, 2012, Riley presented to Dr. David

Hyams, M.D., at The Hospital for Special Surgery.  See R. 306-309.  She reported "chronic

shoulder pain" as a result of the 2011 trauma which was "constant, worse with overhead

activities or lying on the shoulder."  R. 307.  Dr. Hyams wrote that Riley

> ha[d] active forward flexion of 180, abduction to 70 (passive, 140), external
> rotation symmetric to contralateral side at 60 degrees, internal rotation is limited
> to the tip of the scapula.  On the opposite side, she can go to the scapular spine.
> She has 4/5 strength with all rotator cuff muscle testing including the
> supraspinatus, infraspinatus, teres minor as well as subscapularis limited by pain
> and effort.  There is some pain with cross arm adduction but does not reproduce
> her symptoms.  Hawkins' is positive.  Neer is negative.  Spurling's examination is
> negative.  She has full sensation in the extremities.

R. 308.  Radiology revealed "no significant osteophytic changes," but Riley had an "outside

MRI" from October 2, 2011, "which show[ed] small partial-thickness tear of the infraspinatus."

Id.  Dr. Hyams's impression was that Riley's "[p]ain at this time appears multifactorial which

includes possibly tendonitis along with muscular deconditioning and chronic pain."  Id.  Dr.

Hyams recommended physical therapy, Ibuprofen "as needed three times daily . . . [with]

Tramadol for breakthrough pain," and another visit "about 3-4 months after physical therapy."

Id.

3.  Analysis

Riley argues that "the ALJ's dismissal of the severity of Plaintiff's right shoulder impairment without attempting to seek additional information regarding the state of Plaintiff's condition . . . constitutes a failure to fully and [sic] develop the record."  P. Reply at 16.  The Commissioner argues that the ALJ adequately developed the record.  See D. Reply at 17-19.

As previously noted, at the hearing, Riley testified that she could lift only "about five or 10 pounds" due to her shoulder pain.  R. 42.  She also testified that she had seen a "couple of different physical therapists."  Id.  Yet, the record does not contain any records from those physical therapists and is devoid of any evidence that the ALJ sought to obtain such records.

Additionally, the record does not contain any substantive evaluation or assessment of Riley's arm injury after the date of Dr. Hyams's report, October 25, 2012.  As described above, Dr. Hyams's report — authored approximately 10 months after the alleged onset date — indicated "multifactorial" pain including "possibl[e] tendonitis" and recommended a course of physical therapy with a follow-up visit.  R. 308.  At that time, Riley described her pain as "constant, worse with overhead activities or lying on the shoulder."  Id.  There is no medical evidence at all after that date, however, describing Riley's shoulder problems.

The Commissioner argues that evidence postdating Dr. Hyams's October 25, 2012, report constituted a sufficient record on which to determine the level of Riley's impairment.  See, e.g., D. Reply at 17 ("[T]he ALJ referred to and discussed the evidence to determine that Plaintiff's right upper extremity impairment was not of the severity to either significant limit [sic] her ability to perform basic work activities . . . or impose a restriction that exceeded . . . the RFC . . . .").  The only such evidence is a November 7, 2012, radiology report, R. 310, a consultative report authored by Dr. Miller, R. 311-14, and treatment notes from Riley's mental health

24

caregivers, R. 332, 420.  We do not find these documents sufficient, however, to give a full picture of Riley's shoulder impairment.

Riley visited The Hospital for Special Surgery for radiological testing on November 7, 2012.  See R. 310.  The radiology report, however, does not mention Riley's shoulder, upper arm, or her tendonitis diagnosis.  See R. 310.  Indeed, the radiologist only apparently examined Riley's "hand and wrist."  Id.

The consultative psychological examination conducted by John Laurence Miller, Ph.D., on January 2, 2013,[4] R. 311-14, mentions a "[r]ight shoulder tear," R. 314, and listed "[r]ight shoulder pain" as a "[c]hronic and current medical condition[]," R. 311.  This observation was apparently made based on Riley's self-report, because Miller only conducted a "mental status examination," and did not examine her physically.  See R. 312 (capitalization omitted).  This report certainly does not address the extent of any limitations on Riley's use of her shoulder.

The ALJ also relied on notes from two mental therapy sessions.  See R. 19.  One note, however, relates only that Riley "agreed to exercise this week by doing yoga," not that she actually performed yoga.  See R. 332.  Similarly, the note about Riley's "temporary seasonal job," R. 19 (citing R. 420), gives absolutely no detail about what the job was, what it involved, or the reason that Riley stopped working at that job, see R. 420 (Riley "claim[ed] to have completed a temporary seasonal job").

Thus, none of the evidence after the October 25, 2012, visit provides any insight into Riley's functional limitations.

───────────────

[4] Some pages of Dr. Miller's report bear the date "January 2, 2012."  See R. 312-14.  This is clearly an error, however, and "January 2, 2013" is in fact the correct date.  R. 311; accord R. 17, P. Mem. at 7; D. Mem. at 9.

The Commissioner accurately states that "Dr. Napolitano's . . . diagnoses of right shoulder tendonitis and clubbing of all of [Riley's] fingers[] pre-date . . . the alleged onset date," and that "[t]here is no diagnostic or clinical evidence establishing that the supraspinatus tear shown on the 2011 MRI persisted." D. Mem. at 22 (emphasis in original). However, there is evidence that her tendonitis may have persisted. See R. 308 (attributing her pain to "possibl[e] tendonitis"). Additionally, Dr. Hyams noted a "positive" Hawkins' test. Id. "The . . . Hawkins test[] [is a] common assessment[] of shoulder joint impingement. Pain with . . . [this] maneuver[] suggests subacromial impingement and/or rotator cuff tendonitis." Kelsey v. Colvin, 2015 WL 339543, at *5 n.17 (N.D.N.Y. Jan. 23, 2015); see also Mercado v. Colvin, 2016 WL 3866587, at *4 n. 20 (S.D.N.Y. July 13, 2016); Murray v. Astrue, 2010 WL 5290063, at *4 (E.D.N.Y. Dec. 20, 2010). Thus, the status of Riley's arm injury was ambiguous or incomplete as of October 25, 2012.

Additionally, Social Security Ruling 96-7p dictates that an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide." SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996). Thus, in this case, the ALJ should have inquired as to why Riley had not sought medical treatment. Smith v. Astrue, 2013 WL 1192989, at *11-12 (E.D.N.Y. Mar. 22, 2013) (citing SSR 96-7p) (ALJ should have developed the record where record evidence indicated reasons for the plaintiff's decision not to seek further treatment); Genovese v. Astrue, 2012 WL 4960355, at *12 (E.D.N.Y. Oct. 17, 2012) ("[A]n ALJ is required to develop the record regarding a claimant's failure to seek treatment in order to take into account any explanations for such a failure.") (citing SSR 96-7p) (additional citation omitted); Pimenta v. Barnhart, 2006 WL 2356145, at *6 (S.D.N.Y. Aug. 14, 2006) ("To

the extent that the ALJ relied on [the claimant's] refusal to have surgery without determining

whether his refusal was justifiable, the decision was in error.").

The Commissioner argues that any error at Step Two was rendered "harmless" by the

ALJ's subsequent consideration of Riley's arm pain during the RFC analysis.  See D. Mem. at

23; R. 18-19.  However, the failure to develop the record means that the ALJ could not

ultimately rule on Riley's RFC.  See Jackson v. Colvin, 2014 WL 4695080, at *18 (S.D.N.Y.

Sept. 3, 2014) ("[T]he Court cannot rule on whether the ALJ's decision regarding [claimant's]

functional capacity was supported by substantial evidence if the determination was based on an

incomplete record.").

B.  Development of the Record as to Mental Impairments

While not specifically framed as an issue of development of the record, Riley points out

that the opinion of Dr. Miller was written without Dr. Miller's access to extensive mental health

records in the time period June 2011 to June 2014.  See P. Reply at 6; R. 63 (noting the recent

placement into the record of Exhibits 11F through 15F (R. 330-434)).  Dr. Miller's opinion,

however, represented a critical element that led to the ALJ's determination of Riley's RFC and

the ALJ's evaluation of Riley's credibility.  See R. 17-18, 20.  We also note that these records

govern the relevant time period and represent the bulk of plaintiff's treatment records.  Given

that the case requires remand, Dr. Miller (or other practitioner) should be given an opportunity to

review these materials to determine whether they have any impact on the opinion he rendered

regarding Riley's mental impairments.

*     *     *

For the reasons stated above, on remand, the ALJ should (1) make efforts to obtain

treatment notes of any providers of physical therapy; (2) inquire of Riley as to the reason she did

not seek treatment for her shoulder after October 2012; (3) if appropriate, consider having a consultative physician examine Riley to make an evaluation of any impairments relating to her shoulder; and (4) provide to Dr. Miller (or other practitioner) the mental health records appearing as exhibits 11F through 15F to determine whether they have any impact on the opinions expressed in Dr. Miller's report.[5]

To the extent the record as developed may potentially result in a change in the ALJ's determination of Riley's RFC, the ALJ has leave to re-call a vocational expert or take other steps as the ALJ sees fit to develop the record.

IV.  CONCLUSION

For the foregoing reasons, Riley's motion for judgment on the pleadings (Docket # 22) is granted in part and the Commissioner's motion for judgment on the pleadings (Docket # 29) is denied.  The case is remanded for further proceedings consistent with this opinion.

Dated: September 30, 2016
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

---

[5] It will also be helpful if any decision by the ALJ regarding Riley's mental impairments addresses claimed side-effects from her medication, such as fatigue.